IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| C. AND C. S., FOR THEIR MINOR DAUGHTER H.S. Plaintiff | § § § § | |
| v. | § § § | C.A. NO.1:09-cv-00374-TH |
| SILSBEE INDEP.SCH. DIST., SUP'T. RICHARD BAIN, Jr., PRIN. GAYE LOKEY, SISSY McINNIS, DAVID SHEFFIELD, CHRISTIAN ROUNTREE, and RAKHEEM BOLTON Defendants | § § § § § § § § § | TRIAL BY JURY DEMANDED |

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

To the Honorable Judge of Said Court:

Come Now, C. And C. S. ("Plaintiffs") for their minor daughter, H.S.,

Plaintiffs and make this First Amended Complaint and Application for Declaratory

Judgment against Silsbee Indep. Sch. Dist. ("SISD"), Sup't. Richard Bain, Jr.

("Bain"), Principal Gaye Lokey ("Lokey"), Sissy McInnis ("McInnis"), David

Sheffield ("Sheffield"), Christian Rountree ("Rountree"), and Rakheem Bolton

("Bolton") (cumulatively "Defendants"); and by way hereof, Plaintiffs would show

the following:

# I. PARTIES

A.    Plaintiffs

C. and C. S. are the parents of H.S., a student in the SISD, and reside in

Hardin County, Texas. H.S. was sexually assaulted / raped by Defendant Bolton,

who was assisted by Defendant Rountree, in the presence of another and minor male

friend of the two men.

B.    Defendants

1.    SISD is a public school district operating schools and taxing residents

in a geographical area principally in Silsbee, Hardin County, Texas; it

has been served with process herein and appeared by counsel.

2.    Superintendent Richard Bain, Jr.("Bain"), is being sued in his

individual capacity; he has been served with process herein and

appeared by counsel.

3.    Principal Gaye Lokey ("Lokey") is the Principal of Silsbee High

School, is being sued in her individual capacity; she has been served

with process herein and appeared by counsel.

4.    Sissy McInnis ("McInnis") is the SISD Cheerleading Sponsor, and is

being sued in her individual capacity; although she was not served

herein, she has voluntarily appeared by counsel.

5.     David A. Sheffield ("Sheffield") is the District Attorney of Hardin County, is being sued herein in his individual capacity; he has been served with process herein, and appeared by counsel.

6.     Christian Paul Rountree ("Rountree") is a resident of Hardin County , Texas, is being sued herein in his individual capacity;  he has been served with process herein, and appeared by counsel.

7.     Rakheem Jamal Bolton ("Bolton") is a student at Silsbee High School, is being sued herein in his individual capacity;  he has been served with process herein, but has made no appearance.

## II. JURISDICTION

A     This court has jurisdiction pursuant to Title 28 U.S.C.A., §§ 1331 and 3143.

B     The court has supplemental jurisdiction under 28 U.S.C., § 1367 over Plaintiff's claims against Rountree and Bolton for the sexual assault/rape of H.S. because Plaintiffs' claims are so related to the claims within the court's original jurisdiction that they form part of the same case or controversy under Article 3 of the U.S. Constitution.

## III. VENUE

A     Venue is proper in this district under 28 U.S.C., § 1391(a)(1) et seq, because all Defendants reside and are located in this district; and

B     Because the events or omissions giving rise to this claim occurred in this

district.

## IV. SPECIAL STATUTES

A     Title 42 U.S.C., § 1983; and

B     Title 42 U.S.C., § 1988.

## V. EVENTS AND PROTECTED INTERESTS

A     H.S., a female, was born June 28, 1992, one of three daughters born to C. and

C.S.

B     H.S. has been a recognized, if not exceptional, student in the Silsbee

Independent School District, earning grades of A and B.

C     H.S. continued her successful academic performance in the Silsbee High

School.

D     Having a history of participating in cheerleading throughout her junior high

school career, when she entered into Silsbee High School in 2006, H.S. tried

out and was accepted onto the Silsbee High School Cheerleading ("SHSC")

team in her Freshman year.

E     H.S. and her parents signed an agreement with the SHSC, described by the

SHSC as a "contract", each school year from the 2006-2007 school year

through the 2009-2010 school year.

F    The SHSC labeled the agreement for the 2008-2009 school year as the "2008-2009 Constitution".

G    The SHSC Constitution for the 2008-2009 school year was in place when McInnis assumed her position as Chewerleader sponsor.

H    The 2008-2009 SHSC Constitution states in part the following:

1.   "Any cheerleader found not following the established rules and procedures will have appropriate measures taken against him/her.

2.   "The Silsbee High School cheerleading program uses a demerit system that all cheerleaders and parents must sign before tryouts.

3.   "Demerits are given for specific violations of rules and procedures and given at the discretion of the spo0nsor.

4.   "By signing this contract, both parent and cheerleader are agreeing to abide by the demerit system, and the constitution.

I    The SHSC Constitution delineates 29 reasons receiving demerits, and the cheerleaders are assured that they will be notified of demerits as they receive them and reminded when its time to run or walk them off.

J    Two of the Demerit System reasons are numbered 4. and 9., "Disrespect for and non-cooperation with the sponsor, head cheerleader, and other squad

members (5[demerits])", and "Inappropriate conduct as detrermined by the sponsor or the principal (3[demerits])".

K       At no time during the 2008-2009 school year did H.S. have any assessed or cumulated demerits, and no time during the 2008-2009 school year was H.S. notified of demerits having been received by any initialed notice of date of assessment, and/or the time to run/walk the demerits off.

L       In the 2008-2009 SHSC Constitution, "Article VIII-CHEERLEADER REMOVAL" states twelve (12) specific 'reasons' for justifying being "removed from the squad", towit:

1.      "..ten accumulated demerits during the year...";

2.      "Failure to earn the specified cumulative number of credits toward graduation...";

3.      "Two unexcused absences...";

4.      Ineligibility due to grades any two six weeks...";

5.      "Vandalism on campus...";

6.      "Possession and/or use of tobacco products on campus...";

7.      "Theft on campus...";

8.      "Excessive/repeated acts of disrespect and/or defiance toward any staff member or sponsor...";

9.      "Two (2) assignments to ISS (with exception...)...;

10.     "Any assignment to SAC...";

11.     "Suspension, expulsion, or extended homeboud services...";

12.     "If found guilty of any of the following (but no limited to) off-campus

        violations:

        ●    Possession or use of drugs or alcohol

        ●    Possession or use of tobacco products

        ●    Vandalism....

        ●    Theft

        ●    Felony"

L.    H.S.  did not  violate reasons/rules 1-11, and has not been charged with or

      found guilty of any misconduct under reasons/rule 12.

M.    H.S. has admitted to drinking alcohol at the Riley home on October 18, 2008,

      but no charges were filed against her.

N.    Defendant Lokey admitted to C.S. in his conversation with her on March 2,

      2009 that she had not removed H.S. from the SHSC for consuming alcohol,

      and she had received criticism for deciding not to take any disciplinary action

      against H.S. for consuming  alcohol on that occasion.

O.  Consequently, as of March 2, 2009, there existed no charged or established reason in the SHSC Constitution, either from the list of demerits or Reasons for Removal from the Cheerleading squad of which H.S. had been noticed according to the Constitution or in compliance with fundamental fairness which justified or supported any adversarial or disciplinary action taken against her.

P.  The SHSC Constitution made objective representations of conditions and/or processes which governed H.S.' susceptibility to discipline by SISD and/or membership in the SHSC organization, and which expressly limited SISD and Defendants', Bain's, Lokey's, and McInnis' authority to terminate H.S.' membership in the SHCS.

Q.  Those objective representations were depended and/or relied on by Plaintiffs.

R.  H.S. had an objective basis to expect that before she would be disciplined, expelled, barred and banned (present and future) from the SHCS for legal reasons and in a legal way, the contract or SHCS Constitution would at least be satisfied.

S.  At all times material to this cause of action, H.S. satisfied the criteria required for membership in the SHCS, demonstrating academically acceptable

performance, serving as an elected officer in the SHCS, Silsbee High School

Student Council member, "JV" softball player and manager.

T.  Rountree and Bolton were team mates on the Silsbee High School varsity

football team, and on Friday, October 17, 2008 had participated in the game

with Bridge City, where H.S. had participated as a member of the SHCS.

U.  According to the police investigation of the events at the Riley home on

October 18-19, 2008, at approximately 8:30 p.m., H.S. and a girl friend, "B"

drove to the home of Stacy Darlene Riley ("Riley"), mother of a classmate,

who was hosting a party for juveniles. The party was attended by

approximately 12 juveniles, who were underage for purposes of alcoholic

consumption in Texas.

V.  According to the police investigation of the events at the Riley home on

October 18-19, 2008, Riley told the Silsbee police that she did not know that

alcohol was being served to the underage juveniles, and was in her bedroom

watching television while the party was in progress.

W.  According to the police investigation of the events at the Riley home on

October 18-19, 2008, on Sunday October 19, 2008, at approximately 2:30

a.m., H.S., perceived by those present to be under the influence of alcohol,

was standing in the hall near a game room, interacting with some of the other youth.

X.     According to the police investigation of the events at the Riley home on October 18-19, 2008, H.S. was suddenly taken into the game room, where there was a pool table; the door was closed behind her and the lights were turned off.

Y.     According to the police investigation of the events at the Riley home on October 18-19, 2008, although light was coming in through the windows, the alcoholically disabled H.S. couldn't see everyone in the room.

Z.     According to the police investigation of the events at the Riley home on October 18-19, 2008, she was pushed onto the pool table, then picked up and placed on the floor.

A2.    H.S. was extremely frightened.

B2.    H.S. recognized Defendants Rountree and Bolton.

C2.    According to the police investigation of the events at the Riley home on October 18-19, 2008, as H.S. was being put on the floor, someone started pulling her clothes off and fondling her body, and at sixteen years of age, she was raped. She could not legally consent, she did not consented and she did not participate willingly.

D2.    She was intoxicated, underage, and unable in fact or law to consent to the

        sexual assault of her body.

E2.    According to the police investigation of the events at the Riley home on

        October 18-19, 2008, H.S. was frightened, resisted and started crying for her

        attackers to stop.

F2.    According to the police investigation of the events at the Riley home on

        October 18-19, 2008, panicked, H.S. heard someone in the room say, "Dude,

        she said stop it . . . No."

G2.    According to the police investigation of the events at the Riley home on

        October 18-19, 2008, H.S. crawled under the pool table and heard people

        pounding on the door and calling into the room for someone to open the door;

        she heard glass breaking.

H2.    According to the police investigation of the events at the Riley home on

        October 18-19, 2008, the door to the room opened and H.S. recognized the

        voices of the boys coming into the room.

I2.     According to the police investigation of the events at the Riley home on

        October 18-19, 2008, Rountree and Bolton fled through a broken window,

        with Bolton leaving his clothes and shoes, a condom and a receipt with his

        name on it for shoes from a Footlocker store.

J2.   According to the police investigation of the events at the Riley home on October 18-19, 2008, when her perceived rescuers entered the game room, H.S. was under the pool table, where she had crawled for sanctuary, hysterical and crying.

K2.   According to the police investigation of the events at the Riley home on October 18-19, 2008, two boys went and called the home owner, Ms. Riley out of her room, and told her there was a girl crying and several boys had run down the street.

L2.   According to the police investigation of the events at the Riley home on October 18-19, 2008, Ms. Riley went and found H.S. in the game room, lying on the floor under the pool table, crying and partially naked.

M2.   According to the police investigation of the events at the Riley home on October 18-19, 2008, Ms. Riley got H.S. out from under the table and put her in her daughter's room.

N2.   According to the police investigation of the events at the Riley home on October 18-19, 2008, Riley learned that the game room's bathroom window had been broken, and that boys had fled from the house through the window.

O2.　According to the police investigation of the events at the Riley home on

October 18-19, 2008, Riley heard a disturbance outside and ran to

investigate.

P2.　According to the police investigation of the events at the Riley home on

October 18-19, 2008, Riley's son, Jacob, and others were gathered outside

the house.

Q2.　According to the police investigation of the events at the Riley home on

October 18-19, 2008, one of the boys had a sword and another had a bat, and

they were yelling toward a wooded area behind the house.

R2.　According to the police investigation of the events at the Riley home on

October 18-19, 2008, another boy said that he had found clothes and a cell

phone belonging to Bolton in the game room area.

S2.　According to the police investigation of the events at the Riley home on

October 18-19, 2008, Riley recalled that although the boys who were

gathered in the street were yelling for someone to come out of the woods, no

one emerged from the woods.

T2.　According to the police investigation of the events at the Riley home on

October 18-19, 2008, Riley said that she looked down the street and saw

Rountree walking back towards the house and talking on a cell phone, acting

ignorant of events in the house; when he came close to the gathered young people, Rountree asked what was going on and one of the boys said, "You and your friends raped a girl in the house."

U2.   According to the police investigation of the events at the Riley home on October 18-19, 2008, Riley said that she went back into the house and examined the abandoned clothes, and in the pocket of the pants, found a receipt from Footlocker with Bolton's name on it; she placed the clothes in a plastic garbage bag and went back outside.

V2.   According to the police investigation of the events at the Riley home on October 18-19, 2008, Shannon Robinson, a friend of Rountree and Bolton and fellow athlete, and who had earlier been at the party at Riley's house, drove up to collect Rountree and Bolton.

W2.   According to the police investigation of the events at the Riley home on October 18-19, 2008, suddenly, Bolton was in Ms. Riley's face in the driveway, demanding his clothes so he could leave, and ; one of the boys accused Bolton of "raping a girl in the pool room."

X2.   According to the police report, Bolton is quoted to have replied, "I didn't rape no white girl. I wouldn't use anyone else's d--k to f--- her. I didn't put my d--k up inside her. I don't know if she has AIDS, I don't even know that girl."

Y2.   According to the police investigation of the events at the Riley home on October 18-19, 2008, Riley recalled there was yelling back and forth.

Z2.   According to the police investigation of the events at the Riley home on October 18-19, 2008, Bolton was being held back by his friends, all the while yelling, "get me my f---ing clothes and I'm outta here."

A3.   According to the police report, witnesses testified that Bolton threatened Riley's son, saying, "I'm going to f---in' kill you."

B3.   According to the police investigation of the events at the Riley home on October 18-19, 2008, Riley stepped between her son and Bolton, and said, "You don't come here and threaten my son."

C3.   According to the police investigation of the events at the Riley home on October 18-19, 2008, Bolton lunged at Riley, but was held back by his three friends.

D3.   According to the police investigation of the events at the Riley home on October 18-19, 2008, one of Bolton's friends told Riley, "You had better run and get his f---ing clothes."

E3.   According to the police investigation of the events at the Riley home on October 18-19, 2008, Riley's son and Bolton were yelling at each other, exchanging threats.

F3.    According to the police investigation of the events at the Riley home on

       October 18-19, 2008, Bolton was given the bag containing his clothes, and

       his friends started to pull Bolton away.

G3.    According to the police report, witnesses reported that as Bolton was being

       pulled from the scene, he said, "All you motherf---ers better be locked and

       loaded. None of you had better go to sleep tonight."

H3.    According to the police investigation of the events at the Riley home on

       October 18-19, 2008, Riley's son said, "We don't have any guns here," to

       which Bolton replied, "I am going to spray the house and kill everyone in

       there."

I3.    According to the police investigation of the events at the Riley home on

       October 18-19, 2008, Riley called 9-1-1.

J3.    According to a City of Silsbee municipal clerk, Bolton has a history of

       unlawful  behavior at SISD; according to SISD staffers and members of the

       community, Dr. Shae Robinson stated that on March 2, 2009, Bolton walked

       out of her science class and when ordered by her to return, he threatened to

       go get his "AK47" and continued to disobey; Dr. Robinson is also reported to

       have stated that when the high School administrators were informed there was

       no appropriate response made by them; and, Bolton was judicially convicted

of a school related misdemeanor and placed on six months probation on
March 12, 2009.

K3.   When he flaunted the terms of the probation, Bolton was he held in contempt
and incarcerated for three days – instead of the six month period– on July 9,
2009, for being in contempt of court .

L3.   According to the police investigation of the events at the Riley home on
October 18-19, 2008, early on the morning of October 19, 2008, Silsbee
Police officers were dispatched to the Riley house; upon their arrival at 2:40
a.m., according to the police report, the officers learned that a Sexual Assault
of a Minor, H.S., had occurred.

M3.   According to the police investigation of the events at the Riley home on
October 18-19, 2008, another Silsbee Police officer, Jones, was dispatched to
assist in the ongoing investigation of the report of the Sexual Assault, arriving
at approximately 3:00 a.m.

N3.   According to the police investigation of the events at the Riley home on
October 18-19, 2008, Detective Dennis Hughes arrived at the Riley house to
investigate the crime.

O3.   According to the police investigation of the events at the Riley home on
October 18-19, 2008, the police transported H.S. to her home, and H.S.'

mother transported her to Beaumont, to the Child Abuse and Forensic

Services; assisted by Hardin County Crime Victims ("HCCV"), where it was

verified that male(s) had engaged in sexual contact with her.

P3.    According to the District Attorney's file, on October 20, 2008, Justice of the

Peace Robert W. Ward issued Warrants of Arrest for Christian Paul Rountree

and Rakheem Jamal Bolton, and ordered that each be held on $100,000 bond;

a third male, a minor was implicated, but not charged.

Q3.    According to the District Attorney's file, both Rountree and Bolton were

arrested on the morning of October 20, 2008 for the criminal charges of

sexual assault of a child; otrher records indicatethat the arrests occurred at the

Silsbee High School.

R3.    Bail was soon made for both Rountree and Bolton , reportedly with the

assistance of Silsbee City Councilman Thomas Tyler ("Tyler"), a supporter

and ally of Sheffield in his successful March 2008 challenge of District

Attorney Henry Coe.

S3.    Both Rountree and Bolton were released from jail on bond.

T.3    Having won the Democratic  primary for the position of Hardin County

District Attorney, Sheffield had no opponent and merely awaited his January

investiture.

U3.   The presentation of the charges against Rountree and Bolton to a Hardin
      County Grand Jury was delayed until after January 1, 2009.

V3.   It was reported in the Hardin County community that Sheffield and Tyler
      were having serious conversations about rewarding Tyler for his support with
      the appointment to the position of District Attorney's Investigator..

W3.   Tyler became involved in this case reportedly because of his ties to
      Rountree's and Shannon Robinson's respective families, and  because of
      Rountree's and Bolton's  race, and the race of H.S.

X3.   Until 1996,  H.R. "Mike" Holzapfel , was the sheriff of Hardin County; he
      was challenged in 1996 and succeeded by Ed Cain as Sheriff.

Y3.   Holzapfel's politically active assistant deputy sheriff was Tyler, a 1980
      graduate of Silsbee High School, who is a high profile local political leader in
      the African American community, and ardent supporter of SISD's High
      School athletic program.

Z3.   When Ed Cain became Sheriff, Tyler was separated from employment in the
      Sheriff's Department; nevertheless, he remained politically active in the
      County and City of Silsbee. Tyler is a City Councilman.

A4.   After Holzapfel was defeated for the position of Sheriff, he was elected to the
      position of Silsbee City CounciI.

B4.   Tyler was elected to and is a member of the Silsbee City Council.

C4.   In 2000, with Tyler's support, Holzapfel was appointed to the position of Silsbee Police Chief.

D4.   In October 2002, Holzapfel was fired by the Silsbee City Manager in a move that was opposed by Tyler.

E4.   In October 2003, on the strength of Tyler's testimony regarding an illegal meeting of the City Council, Holzapfel filed suit against the City of Silsbee, the Mayor and three City Council members.

F4.   In each of the political actions involving Holzapfel, Tyler has been his former boss' strong supporter.

G4.    In February 2009, with Tyler's support, Holzapfel was appointed Municipal Judge of Silsbee. Holzapfel and Tyler were supporters of Sheffield in his successful bid for the office of Hardin County District Attorney.

H4.   Tyler, not a current defendant herein, is believed to have played a role not only in assisting Rountree and Bolton make bail, but also in conducting a campaign to discredit H.S. and her family, working with Sheffield and the SISD, defendants herein.

I4.  Rountree and Bolton are well-known Silsbee High School athletes, with
Rountree having been a grade ahead of Bolton; Rountree has graduated and
Bolton is still a student at the Silsbee High School.

J4.  In the 2008-2009 school year, Bolton played sports for Silsbee High School,
specifically football team, later being added to the basketball team.

K4.  Rountree was also a member of the football team, having played as a
quarterback and wide receiver, and as a member of the soccer team.

L4.  After the arrest of Rountree and Bolton on October 20, 2008, with the
assistance of the Hardin County Crime Victim's Assistance Center, a Tex.
Code of Criminal Procedure, Chapter 7A injunction/protective order was
issued preventing Rountree and Bolton from proximic accessability to and
communication with H.S.and her family.

M4.  Untrue rumors attacking H.S.' character started up after the October 18-19,
2008 assault; the character attacks against H.S. reportedly emanated from
Rountree/Bolton supporters.

N4.  While under the pretrial protective order, Rountree and Bolton remained
active students in the Silsbee High School and its programs, but were housed
in the SISD's Chapter 37 (TEA) program.

O4.   SISD leadership appeared in conversation with C.S., press conferences and conduct to be sympathetic to Rountree and Bolton and resentful of H.S. for having had alcohol.

P4.   While awaiting the January 27, 2009 Grand Jury, and attending school in the DAEP facility, Rountree and Bolton received tutoring.

Q4.   The Administrators of the SISD, including the women, were insensitive to the victim, H.S., and more sympathetic to her rapists, Rountree and Bolton; they even ignored Bolton's terroristic threats of murder and mayhem against Mrs. Riley and the others, and their lawyer, according to what district officials reported, said the witnesses' reports to the police were " no more than hearsay".

R4.   H.S.' parents were encouraged to stay quiet while the change of power occurred in the District Attorney's office; they were told that the attorney who would take office, Sheffield, was going to be more vigorous than the incumbent in seeking justice for their raped daughter. Plaintiffs learned that representation to be false.

S4.   Sheffield  was invested in office in January 2009, and called H.S.' father for a meeting.

T4.   During the meeting, Sheffield said that although the evidence against
      Rountree and Bolton was strong and exceeded the requisite requirement for
      probable cause, the Grand Jury was racially divided and that the black Grand
      Jurors would not vote to return an indictment against Rountree and Bolton
      because of the race factor. Sheffield said, nevertheless, he would take the
      matter to the Grand Jury to "see what happens."

U4.   H.S.' parents wondered why Sheffield would even take the case to that
      existing Grand Jury with the knowledge that they were so racially prejudiced
      that justice could not be expected or received. H.S.' father asked Sheffield to
      postpone presenting the case to the Grand Jury, and even offered to pay for
      an expert investigator to assist in further investigating and developing the
      case. Sheffield declined the offer.

V4.   The Grand Jury convened on January 27, 2009 under the guidance of
      Sheffield, and while he put H.S. forward as a witness (after having spoken to
      her for no more than 30 minutes prior to her appearance), he did not call
      Riley or any of the persons at the party.

W4.   Oddly, Sheffield did invite the Silsbee Police Chief to testify, even though he
      did not participate in the investigation and was beholden to City Councilman
      Tyler.

X4.  The Grand Jury voted not to indict the "rapists," and the judicial order which kept the two males away from H.S., was permitted by Sheffield to lapse, without renewal.

Y4.  With a press release from Defendant Bain, quoting SISD's lawyer, Rountree and Bolton immediately re-entered SISD's regular academic and athletic programs.

Z4.  H.S.' father, C.S., then went to Sheffield's office to obtain copies of the criminal file.

A5.  C.S.' request for the records was initially denied, and Sheffield asked that C.S. come into his office to discuss the case and his request for copies of records.

B5.  During his remarks to C.S., Sheffield seemed to justify the Grand Jury's decision, and even laughed during his discussion of the case.

C5.  In his comments to C.S., Sheffield made light of the assault on H.S. and the situation; Sheffield also said that she should "stay away from Rountree and Bolton".

D5.  H.S.' family started hearing comments in the community which appeared to be derogatory of H.S. and which purported to indicate detailed knowledge of the official investigationand Grand Jury proceedings.

E5.   C.S. was told by a neighbor that Sheffield had been talking to a local lawyer and the lawyer and his daughter (an office assistant) about H.S. and her charges, and that the lawyer and his daughter were discussing with third parties what Sheffield had said to them.

F5.   C.S. learned that Sheffield had gone to the office of Attorney Bo Horka and discussed the case with Horka and his daughter ( Horka's clerk), and that they/she were/was repeating and discussing Sheffield's comments about H.S. and the case with member(s) of the community.

G.5   C.S. went to Horka's office and met with Horka's daughter.

H5.   Horka's daughter told C.S. that Sheffield had visited with her and her father and during the visit had begun talking about H.S.' claim of rape.

I5.   Horka's daughter said that Sheffield had acted skeptical of the rape claims and minimized the evidence of the incident, treating it not as a criminal act.

J5.   Then, the family of Rountree and Bolton apparently stalked or sought to be seen by  H.S. and/or her family causing concern for safety on H.S.' and a sister's part, and distress to her family.

K5.   Whether in cooperation with a defendant in this case or not, Tyler and/or his supporters have reportedly circulated throughout the community a threat that

"the local NAACP" will file lawsuit(s) in defense of Bolton if he is indicted for raping H.S.

L5. Meanwhile, after the events of October 18-19, 2008, H.S. has been attended by a healthcare organization and its emotional/mental providers.

M5. Immediately after the events of October 18-19, 2008, on advice of her treating healthcare providers and family, H.S. continued to attempt to recover from her ordeal by continuing positive routines such as educational, cheerleading, family, religious and social events.

N5. The football season at Silsbee High School was concluded in mid November 2008, and the varsity basketball season started its regular schedule in mid to late November, 2008.

O5. As a member of the SHCS, H.S.' activities included performing her cheerleading sport at basketball games after the football season had ended.

P5. Because of the Tex. Code Crim. Proc. Art. 7A injunction , "Magistrate's Order for Emergency Protection" in Cause No. 1-12459-08, Hardin County J.P. Ct. 1, which had been entered on October 21, 2008, and noticed to SISD on October 21, 2008 at 8:09 AM, against Bolton (and Rountree),

1.  Bolton's and Rountree's school activities were circumscribed and limited;

2.  Bolton and Rountree were ordered not to go closer than 1200 feet of H.S.' home, her parents' work areas, or the SISD schools where H.S. and her siblings were in attendance;

3.  Consequently, Bolton and Rountree were placed in SISD's DAEP, Chapter 37 facility, and removed from the High School's then current football activities in which both men participated; and

4.  Bolton and Rountree were prohibited from " (A) communicating directly or indirectly with the applicant or any member of the applicant's family or household in a threatening or harassing manner; (B) going to or near the residence, place of employment or business, or child-care facility or school of the applicant or any member of the applicant's family or household; (C)engaging in conduct directed specifically toward the applicant or any member of the applicant's household, including following the person, that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass the person..." .

Q5.  According to Bain, after the January 27, 2009 Hardin County Grand Jury failed to indict either Rountree or Bolton, the SISD attorney advised against any disciplinary action by the SISD against Rountree and/or Bolton, and both men were welcomed back into SISD.

R5.   Under the policies and rules of the SISD's Student Conduct Code, the District has a Board imposed duty "to prohibit and promptly respond to inappropriate and offensive behaviors .." which include "Dating Violence", "Harassment", "Sexual Harassment", and "Retaliation".

S5.   The District's pronounced and express duties "to prohibit and promptly respond" apply to not only on-campus misconduct of students and employees, off-campus misconduct of students and employees "in conjunction with classes and school-sponsored activities", but also the definition, and enforcement of "standards of acceptable behavior" by students and employees– both on and off campus– especially when prohibited conduct or required standard of behavior implicate the educational activities and/or environment.

T5.   The SISD, Bain, Lokey, and McInnis was obligated by policy to conduct a "thorough", and "prompt" investigation "of prohibited conduct", whether by Rountree, Bolton, McInnis, Lokey, or Bain, and take appropriate disciplinary or corrective action..to address the conduct.

U5.   According to SISD policies, "The District may take disciplinary action even if the conduct that is the subject of the complaint was not lawful."

V5.    When the SISD or District defendants herein decided not to investigate and

take disciplinary action against Rountree or Bolton because the Hardin

County Grand Jury did not indict Rountree and Bolton on January 27, 2009, it

deprived H.S. of the liberty interest to be free from (continued) psychological

injuries by being forced to socialize with her violators.

W5.    When the SISD or District defendants herein decided not to investigate or

take disciplinary action against Rountree or Bolton because the Hardin

County Grand Jury did not indict either man on January 27, 2009, it deprived

H.S. of the liberty interest to be free from continued and new psychological

injuries by being forced to socialize with her violators, especially Bolton.

X5.    In fact, SISD weighed its basketball program's and Bolton's interests against

H.S.' welfare and psychological interests, and during the week of February

16, 2009, gave greater weight to its basketball program and Bolton, and

added Bolton to the High School's Varsity Basketball team, where H.S. as

the cheerleader would be forced to interact and cheer for the five man team

including her rapist.

Y5.    H.S. cheered faithfully cheered for the basketball team which included

Bolton.

Z5.  But for the moment when the newly added team member Bolton alone was the performer (for example, when shooting free throws), H.S. without disturbance or disruption did not cheer. She symbolically protested and expressed herself by either quietly folding her arms or going to sit by McInnis.

A6.  McInnis and Lokey criticized H.S. for not cheering Bolton individually, increasing and aggravating her anxiety and stress, and further impairing her recovery from the traumatic events of October 18-19, 2008.

B6.  On February 17, 2009, C.S. and his Plaintiffs' attorney met with Sup't. Bain and when asking about the forced exposure of H.S. to Bolton and Rountree, were told by Bain that he and his lawyer considered there to be two sides to the rape, and that Bain was not going to take any action to insulate H.S. from Rountree and Bolton.

C6.  On February 27, 2009, when at a playoff basketball game in Huntsville, Texas, H.S. cheered for the team and did not cheer for the individual performance of Bolton when he was at the free throw line. H.S. *never* refused to cheer for the team, symbolically protesting and refusing only to cheer for her unpunished rapist, Bolton, who had been added to the basketball team during the week of February 16, 2009, communicating through non-disruptive

and symbolic speech  not merely her disapproval of Bolton's and Rountree's behavior, Bolton's inclusion into a close setting with her, but also to warn others of Bolton's dangerous propensities..

D6.   H.S. was called out of the gym during a break, and in public, was criticized by Bain, an Assistant Superintendent, Lokey, and told to either stop her silence when Bolton was at the free throw line, and cheer her attacker, go home to Silsbee.

E6.   H.S.' parents, who had been motioned by H.S. to join her as she was being escorted out of the gym, joined their emotionally distraught daughter and argued with Bain and the administrators unsuccessfully.

F6.   C. and C.S. drove their daughter home to Silsbee, Texas.

G6.   On Monday, March 2, 2009, Bolton, apparently emboldened by his immunity from regulation, was told by his science teacher to return to his seat, he refused and walked out of the room, and when his teacher, Dr. Shae Robinson went into the hall and ordered him to return to class, he reportedly threatened her by telling her that he would go get his assault rifle.

H6.   When Dr. Robinson made a discipline referral, Bolton was merely returned to class by the Assistant Principal.

I6.   The incident became known and was discussed in the community, and H.S.' father protested unsuccessfully to Bain that Bolton was a dangerous person and should be separated from the regular school.

J6.   Meanwhile, SISD's basketball team was scheduled–with Bolton as a player–to play in two post-season, semi-final basketball games on March 4, 2009, and March 6, 2009.

K6.   H.S.' father and other members of the community continued to express concern about SISD's expansive tolerance of, and indifference to, Bolton's antisocial behavior.

L6.   On March 4, 2009, although C.S. had requested that any letters of discipline intended for H.S. by McInnis or Lokey be given to them before being given to H.S. because of her emotional distress, McInnis and Lokey refused the requested courtesy and McInnis delivered a letter which she signed to H.S. ; that letter clearly was in violation of the SHCS Constitution and permanently removed H.S. from the SHCS.

M6.   According to the policies, the SHCS Constitution, if a cheerleader is removed from the squad, as was H.S., the student is also removed denied the opportunity to participate the following school year.

N6.   H.S. was effectively excluded from future participation in the SISD's

cheerleading program, because as a junior, H.S. was removed and barred

from the squad, with the effect that she was banned from future participation

throughout the balance of her enrollment/attendance at Silsbee High School,

since 2009-2010 is H.S.' senior and final year.

O6.   H.S. told her father who immediately went to the school and met with Lokey

and when questioned by C.S. as to the reason H.S. was being treated

differently and more harshly than other cheerleaders who had committed

serious violations of the SHCS and hadn't been punished at all, Lokey went

to get McInnis and returned with a police officer. When asked by C.S. why

the police officer, Lokey said that she wasn't going to deal with his attitude.

Lokey stated she was catching criticism for not having removed H.S. from the

SHCS for drinking at the Riley house. The meeting was concluded, and C.S.

appealed unsuccessfully to Bain, after which he appealed to the SISD Board.

.

O6.   Meanwhile, Bolton was unpunished forthe events of March 2, 2009, and was

permitted to participate in the basketball game of March 4, 2009.

P6.   After Bolton had participated in the SISD game of March 4, 2009, he was then "punished" for the confrontation with Dr. Robinson by being placed in the In-School Suspension ("ISS") for two school days, March 5-6, 2009.

Q6.   SISD apparently wanted Bolton to play in the March 6, 2009 basketball game as a member of the team; the March 6, 2009 school day was shortened; Bolton's ISS punishment ended on Friday before the team bus departed for the out-of-town venue; the SISD Athletic Director was overheard asking at the team' s destination, "Did Bolton make the bus ?".

R6.   On Friday, March 6, 2009, H.S.' father communicated with the Texas University Interscholastic League ("UIL") regarding Bolton's participation on the SISD team at the March 6, 2009 game.

S6.   The UIL's Compliance Officer contacted SISD regarding Bolton, and Bain removed him from the team bus before it departed Silsbee, and Bolton was removed from the team bus before it departed, and with the season over, Bolton was placed in the SISD's DAEP for the balance of the school year; Rountree was disciplined for having drug paraphernalia on campus, but received only 3 days in ISS.

T6.   On March 12, 2009, Silsbee Municipal Judge Holzapfel convicted Bolton for truancy and assessed a 6 month probated sentence ands community service.

U6.   Meantime, Rountree was selected by an SISD organization for the 2008-2009

scholarship, only withdrawing it at the last minute when attention was drawn

to the award creating embarrassment.

V6.   The current Hardin County Grand Jury has asked to re-examine the sexual

assault charges against Rountree and Bolton on July 28, 2009, and a special

prosecutor , reportedly Sheffield's former co-worker under former Hardin

County District Attorney Roach, has been appointed for the event.

W6.   Bain then lifted the ban on H.S.' future participation in the SISD's

cheerleading program, permitting her to attend tryouts before the end of the

2008-2009 school year. She attended, was selected, and was elected by her

classmates as an officer. Still, the same scenario will be enacted in the 2009-

2010 school year if Bolton is permitted to represent SISD.

X6.   Bolton defied Holzapfel's ordered community service and was held

in contempt on July 7, 2009 and sentenced to 3 days in the Hardin County

jail.

Y6.   For attending the Riley party, attending and participating in a function where

underage drinking occurred, engaging in sex with a minor, raping a minor,

destroying property by breaking a window to escape the Riley house, telling

falsehoods to escape detection and obstruct justice, or threatening persons

with physical violence and death, *neither* Bolton nor Rountree were subjected to similar sanctions as imposed on H.S. by SISD, and/or Bain and/or Lokey, and/or McInnis.

Z6.  Rountree and Bolton have been disparately favored by Defendants, *vis a vis* the treatment accorded H.S., tantamount to the denial to H.S. of equal protection.

A7.  The reasons for denial to H.S. of equal protection by Defendants Sheffield and/or SISD and/or Bain, and/or Lokey, and/or McInnis, are:

1.  Gender;

2.  H.S.' exercise of fundamental rights

a.  by reporting the sexual assault by two athletes,

b.  the non-disruptive, symbolic protest against Bolton alone.

B7.  Sheffield has deprived H.S. of protected liberty interests in being free from infringement of bodily integrity (psychological injury) and/or stigmatization for unconstitutional reasons (effectively claiming that she is incredible in the charges she has made against Rountree and Bolton) by his, Sheffield's endorsing Rountree's and Boltons lack of culpability, his discrediting of H.S.' testimony, and the absence of Grand Jury evidence presented by him on

January 27, 2009 to establish probable cause supporting Rountree's and

Bolton's being indicted.

C7.  Sheffield has no absolute immunity for non-prosecutorial misconduct such as:

1.  Sheffield's press conference on January 27, 2009, posted in the Silsbee

Bee newspaper on Tuesday, January 24, 2009 at 7:48 P.M., whereat he

stated, *inter alia*, "I'm not surprised by the [no-bill] decision after

seeing the evidence I've been privy to..." in clear reference to the only

involved person whom he called–and that against the advice of her

mental healthcare provider– H.S. ; and

2.  Sheffield's social conversations with Bo Horka and his adughter (and

other third parties in the community) wherein Sheffield discussed his

recollection and views of the private evidence of H.S. and others

presented in the confidential Grand Jury proceedings of January 27,

2009, and Sheffield's falsely skewing in his public recitations the

quality and testimony of H.S. to the Grand Jury, as well as other Grand

Jury evidence related to the events of October 18-19, 2008 for the

benefit of Rountree and Bolton, and to accommodate Tyler.

D7.  SISD's denied H.S. protected liberty and property interests without due

process of law, procedural or substantive.

E7.    The protected interests denied to H.S. by SISD and/or Bain and/or Lokey

and/or McInnis are as follow:

1.    Property:

    a.    Membership in the SHCS subject to being terminated only for

       establishment of a listed reason for termination as set forth under

       the cause under the SHCS Constitution;

    b.    Membership in the SHCS subject to being terminated only

       according to the processes set forth in the SHCS Constitution;

    c.    The anti-retaliation policy in the SISD's policies as protect

       students who make reports of violations of the SISD Student

       Code of Conduct.

2.    Liberty :

    a.    Freedom from punishment in the absence of personal guilt;

    b.    Freedom from infringement of bodily integrity;

    c.    Freedom from stigmatization in retaliation for exercise of a

       constitutional right;

    d.    Freedom to speak freely on any matter as secured to all persons

       in Texas under Article One, Section 8 of the Texas Constitution;

    e.    Freedom from discipline for arbitrary and capricious reasons;

      f.     Freedom from being required to cheer for Bolton, whether

           required in public or private.

F7.    Plaintiff(s), H.S. (and her parents on her behalf), exercised protected speech

as follows:

    1.     Reporting the sexual assault by Bolton in which he was assisted by

          Rountree ;

    2.     Engaging in non-disruptive , symbolic silence on the gym floor at

          sporting contests when H.S. appears as a member of the SHCS, when

          Bolton is shooting the basketball from the free throw line;

G7.    H.S., through her parents, appealed her March 4, 2009 exclusion from the

SHCS to the SISD administration and then to the SISD Board.

H7.    At the appeal after having been excluded from the SHCS for two games, and

since Bolton was in DAEP and not permitted to participate in SISD athletic

events for the remainder of the 2008-2009 school year, H.S. was permitted to

try out for the Cheerleading Squad; she was selected again, chosen to serve

as an officer, and has attended the summer cheerleading camp at Sam

Houston University.

I7.    Meanwhile, in addition to H.S.' public humiliation and termination from the

SHCS in violation of the SHSC's rules, the SISD's refusal to adhere to the

SISD policies as relate to the Student Code of Conduct and investigate the

events of October 18-19, 2008 at the Riley house as relate to claimed

misconduct by Rountree and Bolton, and retaliation against H.S. for her

exercise of protected speech, the 2009-2010 school year lis imminent and

Bolton's re-involvement with SISD athletics looms ahead.

J7.   SISD has revealed by its past conduct its future course when H.S.' interests

are in opposition to those of the SISD male athletes and the season's goals of

the Athletic Department; in the coming school year, it is probable that the  as

it did in the current school year, H.S. will be set up for not cheering her rapist

on – when performing alone and in the spotlight.

## VI. CAUSES OF ACTION

A.   Against Sheffield, individually, Plaintiffs bring claims of having violated

clearly established constitutional law by:

1.   Acting in non-privileged and non-prosecutorial functions to deprive

H.S. of protected liberty interests;

2.   Acting in non-privileged and non-prosecutorial functions to retaliate

against H.S. for reporting the sexual assault of persons who are

supported by his political supporter Tyler, and because of her father's

persistence in the pursuit of justice for his daughter by pressing

Sheffield to release the case file to C.S. for presentation to third

parties, by discrediting and stigmatizing H.S. in a press conference and

in social conversations with Bo Horka and his daughter, and others;

3.    Sheffield has falsely stigmatized H.S. with clear inferences of

responsibility for her own rape in retaliation for her having reported

and sought prosecution of Rountree and Bolton for the crime;

4.    The false stigmatization of H.S. has been performed in such a manner

that H.S., the victim being blamed for being a victim has been denied

the opportunity to clear her name of his thinly veiled charges or defend

herself;

5.    Unless enjoined, will continue to pump his decisions and thereby

endorse the clearing of Bolton and Roundtree.

B.    Against Bolton and Rountree for the pendent state claims of assault and

defamation.

C.    Against SISD, Bain, Lokey, and McInnis for denying to H.S. equal protection

of policies and law, depriving her of protected property and liberty interests

without due process of law, and retaliating against her for her exercise of

protected speech, including non-disruptive speech in protest at the basketball

games when Bolton alone was standing at the free-throw line.

D.    Individual defendants acted with culpable intent and caused Plaintiffs to suffer foreseeable harm, all in violation of clearly established constitutional and legal principles.

## VII. PRAYER

A    After trial to a jury, Plaintiffs seek a declaratory judgment whereby Defendant Sheffield would be declared to have violated Plaintiffs' respective constitutional rights.

B    After trial to a jury, Plaintiffs seek a judgment against each individual Defendant whereby H.S. would be compensated in money for the harm which the Defendants have inflicted on her.

C    After trial to a jury, Plaintiffs seek a judgment against each individual Defendant whereby H.S. would be paid punitive or exemplary damages for their respective acts performed with actual malice to harm H.S.

D    After trial to a jury,  Plaintiffs seek from the Court an award of reasonable attorneys fees and costs pursuant to Title 42 § 1988 for having acted as private attorneys general.

E    After trial to a jury, Plaintiffs seek a judgment awarding all other relief to which they are entitled in law or equity.

Respectfully submitted,
WATTS & ASSOCIATES


By:  /S/ LW

Larry Watts
SBN 20981000
P.O. Box 2214
Missouri City, TX 77459
Phone (281) 431-1500
Fax (281) 431-1298
Wattstrial@gmail.com


## CERTIFICATE OF SERVICE

I, Larry Watts certify that a true and correct copy of this document has been served on opposing counsel by filing with the Clerk's CM/ECF system on this the 24th day of July, 2009.

/S/ LW

Larry Watts